## UNITED STATES DISTRICT COURT

### DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE TRUMPETER SWAN SOCIETY,**<br>12615 County Road 9<br>Plymouth, MN 55441; | Case No.: |
| **CASCADES RAPTOR CENTER,**<br>32275 Fox Hollow Rd<br>Eugene, OR 97405; | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **CENTER FOR BIOLOGICAL DIVERSITY,**<br>1333 North Oracle Rd<br>Tucson, AZ 85705; | |
| **LOON LAKE LOON ASSOCIATION,**<br>39917 North Shore Dr<br>Loon Lake, WA 99148; | |
| **PRESERVE OUR WILDLIFE ORGANIZATION,**<br>4238 65th Terrace East<br>Sarasota, FL 34243; | |
| **TENNESSEE ORNITHOLOGICAL SOCIETY,**<br>4962 Gwynne Rd<br>Memphis, TN 38117;<br>and | |
| **WESTERN NEBRASKA RESOURCES COUNCIL,**<br>205 N. Mears St<br>Chadron, NE 69337; | |
| Plaintiffs, | |
| v. | |
| **ENVIRONMENTAL PROTECTION AGENCY,**<br>Ariel Rios Building<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460; | |
| **LISA P. JACKSON**, Administrator,<br>Environmental Protection Agency<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460; | |
| Defendants. | |

**INTRODUCTION**

1.      Plaintiffs THE TRUMPETER SWAN SOCIETY, CASCADES RAPTOR CENTER, CENTER FOR BIOLOGICAL DIVERSITY, LOON LAKE LOON ASSOCIATION, PRESERVE OUR WILDLIFE ORGANIZATION, TENNESSEE ORNITHOLIGICAL SOCIETY, and WESTERN NEBRASKA RESOURCES COUNCIL (collectively "Plaintiffs") bring this civil action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq*, for review of the decision by Federal Defendants ENVIRONMENTAL PROTECTION AGENCY and LISA P. JACKSON, Administrator of the Environmental Protection Agency (collectively "the EPA") to regard Plaintiffs' petition to initiate a rulemaking proceeding under the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 *et seq*.. for toxic lead bullets and shot ("Petition") as not cognizable under TSCA.  To the extent that the EPA's action constituted a denial of the Petition, Plaintiffs bring this action under Section 21 of TSCA 15 U.S.C. § 2620(b)(4)(B), for *de novo* review of the Petition.

2.      TSCA grants the EPA the broad authority to regulate chemical substances that "present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2601.  The EPA may regulate the manufacture, processing, distribution, use or disposal of such chemical substances.  The EPA has already declared that lead is a toxic substance, and although it has implemented some regulations to reduce lead exposure, lead still remains widely distributed in the environment in the form of spent lead bullets and shot and regularly encountered by wildlife leading to harmful lead exposure.

3.      On March 13, 2012, Plaintiffs, along with 94 other organizations, submitted a petition to the EPA to initiate a rulemaking pursuant to Section 21 of TSCA. Petitioners submitted the petition because of the unreasonable risk posed by lead bullets and shot, the widespread availability of alternatives to lead bullets and shot, and the EPA's authority to regulate these substances.  The Petition requested that the EPA initiate a rulemaking for regulations that adequately protect wildlife, human health and the

environment against the unreasonable risk of injury from bullets and shot containing lead used in hunting and shooting sports, which have the potential to cause harmful lead exposure to wildlife and humans.

4.      By letter dated April 9, 2012, the EPA informed the petitioners that the EPA "does not consider the 2012 submission to be a new petition cognizable under section 21."  The EPA stated that it regarded the 2012 petition as substantially the same as a petition dated August 10, 2010, seeking the ban of lead shot, bullets, and fishing sinkers and claimed that to the extent there were differences between the two petitions, they were not substantive.

5.      In its April 9, 2012, letter, the EPA also stated that "even if the 2012 submission could be considered to be a request for reconsideration, EPA would deny it because the 2012 submission does not present significant newly discovered, non-cumulative material."

6.      The EPA further stated in its April 9, 2012, letter that "even if the 2012 submission were considered to be a new or different petition cognizable under section 21 of TSCA, EPA would deny it for the same reasons it denied the 2010 petition," citing 75 Fed. Reg. 58,377 at 58,378 (Sept. 24, 2010).

7.      The EPA wrongfully determined the Petition was not "cognizable" under TSCA and thus wrongfully disregarded it.  The EPA's actions were contrary to the plain language of TSCA, which requires the EPA to either grant or deny a petition.  15 U.S.C. § 2620(b)(3).  TSCA does not authorize the EPA to redefine a submitted petition as a resubmittal or request for reconsideration and does not provide the EPA with the authority to impose standards on submitted petitions that are in excess of those described in the statute or applicable regulations.

8.      The EPA wrongfully characterized the 2012 petition as substantially the same as the 2010 petition.  The two petitions contain substantially different requests; while the 2010 petition sought a complete ban on *all* lead bullets and shot, the 2012

petition sought to initiate a rulemaking for regulations that adequately protect wildlife, human health and the environment against the unreasonable risk of injury from bullets and shot containing lead used in hunting and shooting sports (specifically excluding military and law enforcement uses) which have the potential to cause harmful lead exposure to wildlife and humans.  Further, the 2012 petition was brought by a different and much larger group of petitioners.  Finally, the 2012 petition introduced significant new information regarding the toxic effects of lead ammunition on wildlife, the toxic effects of lead on human health, the availability and performance of alternatives to lead ammunition, the effectiveness of lead ammunition regulations, and the legal authority of the EPA to regulate bullets and shot.

9.      The EPA's decision that the 2012 petition was substantially the same as the 2010 petition and therefore not cognizable under Section 21 of TSCA violated the APA, as it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

10.     Alternatively, to the extent that the EPA's April 9, 2012, letter constituted a denial of the Petition under Section 21 of TSCA, Plaintiffs seek *de novo* review of the Petition by this Court.  The EPA has the authority to regulate lead in bullets and shot, and the Petition clearly demonstrates that there is a reasonable basis for concluding that a rule or order is necessary to protect health or the environment against an unreasonable risk of injury to health or the environment.  Therefore, Plaintiffs ask that the Court order the EPA to initiate a rulemaking proceeding to develop and implement regulations that adequately protect wildlife, human health and the environment against the unreasonable risk of injury from bullets and shot containing lead used in hunting and shooting sports, which have the potential to cause harmful lead exposure to wildlife and humans.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction in this matter pursuant to 5 U.S.C. § 702 (APA) and 15 U.S.C. § 2620(b)(4)(A) (TSCA).

12.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e), because the Defendant resides in this district and a substantial part of the events and omissions which gave rise to this action occurred in this district.

## RELATED CASE

13.     Pursuant to Local Rule 40.5, this action is related to a previous action filed by one of the present Plaintiffs, Center for Biological Diversity, against the same Defendants in this action.  The previous action, *Center for Biological Diversity, et al. v. Jackson, et al*., 10-CV-2007 (EGS), was dismissed by court order on April 30, 2012.  The previous action was brought under TSCA and concerned the EPA's denial of the 2010 petition.

## PARTIES

14.     Plaintiff THE TRUMPETER SWAN SOCIETY ("TTSS") is a 501(c)(3) non-profit corporation founded in 1968 and based in Minnesota.  TTSS works throughout North America to assure the vitality and welfare of wild Trumpeter Swans.  Trumpeter Swans are the largest species of waterfowl in the world and occur naturally only in North America.  By the 1930's Trumpeters were headed for extinction with fewer than 90 remaining in the United States, confined to the Greater Yellowstone area.  The efforts of conservation groups, private citizens, and public agencies have resulted in significant recovery of Trumpeters.  However, Trumpeter numbers are still well below pre-settlement levels and they are still absent from significant parts of their historic range. TTSS Board of Directors and membership includes most of the swan experts engaged in swan population and habitat research and management in the United States and Canada. They assist federal, state, provincial, tribal, and private organizations in these endeavors and with environmental education efforts centered on wetland and swan conservation. Lead poisoning of Trumpeter Swans is one of the most serious mortality factors the species faces.  TTSS has been involved with lead poisoning research, mitigation, rehabilitation, and education related to Trumpeter and Tundra swan mortality for

decades.  Since 1999 a minimum of 3,000 Trumpeter and Tundra swans have died from lead poisoning in Washington State and adjacent British Columbia.  Most of the deaths were attributed to spent lead shot deposited during waterfowl hunting.  Lead shot, fishing sinkers, and bullets persist in the environment for many years and can kill swans and other wildlife decades after deposition.  TTSS has avid hunters as members, staff, and directors.  TTSS brings this action on behalf of its adversely affected members, staff, directors and, most of all, the swans.

15.     Plaintiff CASCADES RAPTOR CENTER ("CRC") is a non-profit 501(c)(3) nature center and wildlife hospital specializing in birds of prey (raptors).  Incorporated in Oregon in 1990, CRC has over 2500 members and supporters and produces a listserve, "RaptorCare," and participates in conferences that together reach thousands of wildlife rehabilitators.  CRC also attracts visitors from throughout the country and internationally to see its very diverse collection of native birds, none of whom can be returned to the wild for one reason or another.  As a nationally known raptor rehabilitation facility, CRC has received and treated lead-poisoned birds, published an article on eagle poisoning cases in both a veterinary journal and a wildlife rehabilitation journal, and has an active public education component regarding lead and other secondary poisonings.  CRC receives from the Oregon Department of Fish & Wildlife or the Oregon State Police hunter-shot game meat that has been confiscated from poachers, but CRC must radiograph all packets before feeding the meat to the birds in order to find and discard those sections that have lead fragments.  CRC staff, members, and supporters have a strong vested interest in removing lead from ammunition and thereby removing one more human-caused problem for the wildlife CRC serves.  CRC staff, members, and supporters intend to continue their work on behalf of raptors and to eliminate lead from the environment in the future.  CRC brings this action on behalf of its staff, volunteers, members, and supporters who appreciate wildlife and are concerned about the perils we as humans create for all nature.

16.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a non-profit 501(c)(3) corporation with offices in Arizona, California, Oregon, Alaska, Florida, Vermont, and Washington, D.C.  The Center works throughout the United States and the world to protect endangered species and wild places through science, policy, education, citizen activism, and environmental law.  The Center and its 42,000 members have an ongoing interest in protecting wildlife from lead poisoning.  Center members and staff observe, research, study, and seek protections for the wildlife species that are vulnerable to lead poisoning by lead bullets and shot and intend to continue to do so in the future. The Center's members and staff derive scientific, recreational, conservation, and aesthetic benefits from these species' existence in the wild and these benefits will be harmed by the damage to wildlife by lead bullets and shot.  Since 2004, the Center has taken action through its "Get the Lead Out" campaign to change state and federal policies in order to prevent toxic lead from entering the food chain.  The Center has been a leading proponent of regulations on lead ammunition to protect endangered California condors, bald and golden eagles, and other wildlife species at risk from lead poisoning. The Center brings this action on its behalf and on behalf of its adversely affected members and staff.

17.     Plaintiff LOON LAKE LOON ASSOCIATION ("LLLA") is a non-profit 501(c)(3) corporation located at Loon Lake, Washington.  LLLA and its 200-plus members are dedicated to protecting the common loon and other waterbird species, such as the red-necked grebe, at Loon Lake, Washington.  LLLA's staff and members monitor common loon and red-necked grebe populations, band individual birds and draw lab samples to monitor toxins and contaminants, promote conservation measures to protect waterbird habitat and wetlands, engage in scientific research, and engage in educational outreach.  LLLA's members and staff intend to continue these and other activities to protect loons and other waterbirds in the future.  Lead toxicosis from ingesting lead shot and fishing sinkers is the leading mortality factor for the common loon in Washington

and is a major limiting factor for Washington's loon population.  Lead is also a well-known toxin to humans and other species.  The Center for Disease Control has stated that "a piece of lead as small as a grain of sand is enough to poison a child."  As part of its work to protect loons, Loon Lake Loon Association helped develop the educational pamphlet, "Get the Lead Out of Washington and Responsible Fishing Practices," and helped enact legislation that requires non-lead fishing tackle to be used at 13 common loon nesting lakes in Washington.  LLLA brings this action on behalf of its adversely affected members and staff.

18.     Plaintiff PRESERVE OUR WILDLIFE ORGANIZATION ("POWO") is a non-profit unincorporated organization based in Sarasota, Florida.  POWO works toward the protection and preservation of all wildlife species and their habitats through the production and distribution of educational DVDs, articles, and other media and through giving educational presentations throughout the U.S.  POWO also supports the work of The Raptor Center of the College of Veterinary Medicine at the University of Minnesota, and other nationally recognized wildlife and habitat preservation organizations.  POWO's work on behalf of raptors, especially bald eagles, has made it aware of the appalling and preventable effects of lead poisoning on these species.  To this end, POWO had been actively engaged in advocacy and educational activities advocating the replacement of toxic lead used in hunting and fishing as part of its efforts to educate sportsmen and sportswomen on the need to preserve our wildlife through this modest change in behavior.  POWO members observe, research, study, and seek protections for the wildlife species that are vulnerable to lead poisoning by lead bullets and shot and intend to continue to do so in the future.  POWO brings this action on behalf of its adversely affected members.

19.     Plaintiff TENNESSEE ORNITHOLOGICAL SOCIETY ("Society") is a 501(c)(3) non-profit organization with almost 1000 members organized into 11 chapters throughout Tennessee.  The purposes of the Society are to promote the science of

ornithology in Tennessee, to publish the results of its investigations, to advocate for the passage and enforcement of wise and judicious laws for bird protection, and to promote bird study and protection by any other means that may from time to time be deemed advisable.  The Society is deeply concerned with the adverse effects of toxic lead poisoning (lead toxicosis) via the ingestion of pellets and bullet fragments from expended lead ammunition.  Lead pellets are often mistaken for grit and bullet fragments are consumed from scavenged carcasses.  Conservative estimates are that between eight and ten million birds die each year from lead poisoning.  Lead poisoning is a major cause of mortality in endangered California Condors and Bald and Golden Eagles.  Other species at great risk include: hawks, owls, vultures, waterfowl, doves, ravens, crows, magpies and jays.  Society members, volunteers, and directors observe, research, study, and seek protections for the wildlife species that are vulnerable to lead poisoning by lead bullets and shot and intend to continue to do so in the future.  The Society brings this action on behalf of its adversely affected members, volunteers, and directors.

20.     Plaintiff WESTERN NEBRASKA RESOURCES COUNCIL  ("WNRC") is a 501(c)(3) non-profit organization formed in 1983 that is dedicated to preserving the quality of watersheds and native biomes while maintaining a healthy lifestyle in Western Nebraska.  WNRC members and staff work to accomplish its mission by educating the public and policymakers and through hands-on work.  WNRC members enjoy the wild natural beauty within Nebraska beyond what words can describe.  The toxicity of 'uncontained' lead within natural systems never stops killing.  WNRC believes that it is necessary to stop this uncontrolled broadcast of lead ammunition and fishing weights that are harming our native ecosystems.  WNRC members observe, research, play within and make a living from healthy natural systems, including wildlife that are vulnerable to lead poisoning by lead bullets and shot and intend to do so in the future.  WNRC regards the broadcast of lead and the lead poisoning of wildlife as an assault to our native ecosystems

and to our personal health and well-being.  WNRC brings this action on behalf of its
adversely affected members and staff.

21.     The continued poisoning of wildlife due to lead bullets and shot existing in
the environment, unabated because of EPA's refusal to enact regulation in response to
Plaintiffs' Petition, harms the wildlife species that Plaintiffs, their members, and staff
observe, research, study, and seek to protect.  Plaintiffs' scientific, recreational,
conservational, and aesthetic enjoyment of these species and their habitats are thus
harmed by EPA's refusal to take action pursuant to the Petition.  Plaintiffs' members and
staff include individuals with varying interests in the protection of wildlife, ranging from
scientific, professional, and educational to recreational, aesthetic, moral, and spiritual
interests.  Further, Plaintiffs' members and staff have visited and intend to visit in the
future those areas inhabited by lead-affected wildlife.  Plaintiffs' members and staff
utilize, on an on-going basis, the biological, scientific, research, education, conservation,
recreational and aesthetic values of the habitats of lead-affected wildlife.

22.     Plaintiffs' staff and members observe and study wildlife affected by lead
and derive professional, scientific, educational, recreational, aesthetic, inspirational, and
other benefits from these activities and have an interest in preserving the possibility of
such activities in the future.

23.     Defendant ENVIRONMENTAL PROTECTION AGENCY is the federal
agency charged with implementing TSCA.

24.     Defendant LISA P. JACKSON, Administrator of the Environmental
Protection Agency, is the highest ranking official within the Environmental Protection
Agency and, in that capacity, has the duty and authority to administer TSCA.  She is sued
in her official capacity.

**STATUTORY BACKGROUND**

25.     After finding "that human beings and the environment are being exposed
each year to a large number of chemical substances and mixtures" including "some

whose manufacture, processing, distribution in commerce, use or disposal may present an unreasonable risk of injury to health or the environment," Congress enacted TSCA and assigned its administration to the EPA. 15 U.S.C. § 2601(a).

26.     Under Section 21 of TSCA, 15 U.S.C. § 2620, any person may petition for a rule, and such a petition must set forth facts that establish the requested action is necessary.

27.     TSCA requires that the EPA either grant or deny a petition for a rule.  15 U.S.C. § 2620(b)(3).

28.     TSCA mandates that the EPA must regulate chemical substances where there is a "reasonable basis to conclude" that such substances "present an unreasonable risk of injury to health and or the environment." 15 U.S.C. § 2605(a).  In evaluating unreasonable risk the EPA must consider: A) the effects of the chemical on health and the magnitude of human exposure; B) the effects of the chemical on the environment and the magnitude of environmental exposure; C) the benefits of the chemical for various uses and the availability of substitutes for such uses; and D) the reasonably ascertainable economic consequences of the rule, after consideration of the effect on the national economy, small business, technological innovation, the environment, and public health. 15 U.S.C. § 2605(c)(1).

29.     Factual certainty of the magnitude of the risk to health and the environment is not required.  The EPA may base its decision not only on known facts, but also on scientific theories, projections and extrapolations from available data, and modeling using reasonable assumptions. H.R. Rep. No. 94-1341, at 32 (1976).

30.     TSCA authorizes the EPA to prohibit "the manufacturing, processing, or distribution in commerce" of a chemical substance for a particular use or uses. 15 U.S.C. § 2605(a)(2)(A)(i).

31.     Lead used in shot and bullets are "chemical substances" falling within the regulatory scope of TSCA.  Except as provided in subparagraph (B), the term "chemical

substance" means "any organic or inorganic substance of a particular molecular identity, including (i) any combination of such substances occurring in whole or in part as a result of a chemical reaction or occurring in nature and (ii) any element or uncombined radical." 15 U.S.C. § 2602(2)(A).

32.     It is indisputable that lead is a chemical substance.  The EPA has already declared that lead is a toxic substance, and has removed nearly all products containing lead from the market.  Most other uses of lead, such as lead-based paints, plumbing pipe and fixtures, and leaded gasoline, are already subject to strict regulation.  The EPA has recently initiated additional regulatory actions to reduce lead exposure, for example: in January 2008, EPA added lead and lead compounds to its Priority Testing List, requiring certain manufacturers to submit unpublished health and safety reports to the EPA (40 C.F.R. 716.120); the EPA recently announced its intention to phase out lead automobile wheel balancing weights; and manufacturers of consumer products intended for use by children who also manufacture lead or lead compounds are required to report certain health and safety data to the EPA.  However, EPA has still not taken any action to regulate lead bullets and shot under TSCA.

33.     Certain chemical substances are excluded from the definition of "chemical substances" for the purpose of regulation under TSCA.  "Any article the sale of which is subject to the tax imposed by section 4181 of the Internal Revenue Code of 1986" is excluded from regulation under TSCA. 15 U.S.C. § 2602(B).  Section 4181 of the Internal Revenue Code establishes excise taxes for shells and cartridges. 26 U.S.C. § 4181.

34.     Shells and cartridges are manufactured products that consist of several component parts, *inter alia* shot and bullets, that are themselves separately manufactured and sold and then assembled together to make ammunition.  Shells and cartridges are not defined under TSCA.

35.     The Internal Revenue Service has clarified items that are not included as part of the excise tax of shells and cartridges.  In 1968, eight years prior to the passage of TSCA, the Internal Revenue Service in a Revenue Ruling stated, "The manufacturers excise tax imposed upon sales of shells and cartridges by section 4181 of the Internal Revenue Code of 1954 *does not apply* to sales of separate parts of ammunition such as cartridge cases, primers, bullets, and powder." IRS Rev. Rul. 68-463, 1968-2 C.B. 507 (emphasis added).  This ruling has been confirmed by subsequent administrative decisions. (*See*, *e.g*., Fed. Tax Coordinator ¶ W-2911(2d.)).

36.     This IRS ruling, along with the legislative history of TSCA, makes clear that the component parts of ammunition, namely shot and bullets, may be regulated as chemical substances under TSCA.

37.     The House legislative committee responsible for authoring TSCA makes clear that it intended that the EPA regulate components in ammunition:

> "Although the language of the bill is clear on its face as to the exemption for pistols, revolvers, firearms, shells, and cartridges, the Committee wishes to emphasize that it does not intend that the legislation be used as a vehicle for gun control. Consequently the Administrator has no authority to regulate ammunition as an unreasonable risk because it injures people when fired from a gun. However, the Committee does not exclude from regulation under the bill chemical components of ammunition which could be hazardous because of their chemical properties."

H.R. Rep. No. 79-313, at 418 (1976) (Committee print)

38.     The Senate Report of TSCA also indicates that it intended that EPA regulate components in ammunition, noting under TSCA that while "chemical substance" does not include ammunition, it is only "to the extent subject to taxes imposed under § 4181 of the Internal Revenue Code." *Id*. at 171.

39.     Section 21 of TSCA provides for citizen's petitions which may request that the EPA initiate proceedings to issue, amend, or repeal rules promulgated under

TSCA. 15 U.S.C. § 2620(a).  The Administrator shall either grant or deny the petition within 90 days.  If the Administrator grants the petition, the Administrator shall promptly commence an appropriate proceeding.  If the Administrator denies the petition, the Administrator shall publish in the Federal Register the reasons for the denial.  If such a petition is denied, or if the agency neither grants nor denies the petition, the petitioner may bring a civil action in a district court and is entitled to a *de novo* judicial review of the entire petition. 15 U.S.C. § 2620(b)(4)(A)-(B).

40.     Section 702 of the APA provides that any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof." 5 U.S.C. § 702.

41.     Section 704 of the APA states that "agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

42.     Section 706 of the APA states that the "reviewing court shall

> 1.     compel agency action unlawfully withheld or unreasonably delayed; and
> 2.     hold unlawful and set aside agency action, findings, and conclusions found to be—
>> a.     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>> b.     contrary to constitutional right, power, privilege, or immunity;
>> c.     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>> d.     without observance of procedure required by law;
>> e.     unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>> f.     unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

5 U.S.C. § 706.

## FACTUAL BACKGROUND

**A.      Toxicity of Lead**

43.      Lead is toxic to organisms, even at very low levels, and has lethal and sublethal effects at higher levels.  It is a cumulative metabolic poison affecting a large number of biological functions including reproduction, growth, development, behavior and survival.  Even low levels of exposure to lead can cause neurological damage and there may be no safe level of lead in the body tissues of fetuses and young.  Despite this knowledge, lead continues to be used in manufactured products, many of which are sources of toxic lead exposure to wildlife and to human beings.

44.      Lead bullets and shot are used in hunting and may directly or secondarily expose wildlife to lead and deposit bioavailable lead into the environment.  Despite the ban on lead shot for waterfowl hunting, large amounts of spent lead bullets and shot continue to be deposited in the environment through hunting of big game, upland species, furbearers, and from predator control activities.

45.      There is extensive documentation showing that lead shotgun pellets accumulate in both aquatic and terrestrial habitats, where animals encounter and ingest these lead items, often mistaking them for food, grit or bone fragments.  More than 130 species of animals (including mammals, upland birds, raptors, waterfowl, amphibians and reptiles) have been reported in scientific literature as being exposed or killed by ingesting lead shot, bullets, bullet fragments or prey contaminated with lead bullets or shot.

46.      Particularly susceptible are avian scavengers that encounter lead in carcasses left in the wild, in gut piles (viscera) from animals cleaned by hunters in the wild, and in wounded prey species that survive hunting and carry lead bullets or shot in their bodies.  Sensitive species such as bald and golden eagles and endangered California condors are frequently killed by lead poisoning or suffer chronic sublethal effects of lead poisoning from scavenging meat containing lead fragments from bullets or shot.

47.      Ducks, geese, swans, and their predators have received some protection from hunting sources of secondary lead poisoning since 1991 by a federal requirement to

use only nontoxic shot for hunting waterfowl, but similar restrictions in terrestrial habitats are scattered and localized.  Data now show that over 75 terrestrial species of birds are known to be poisoned by spent lead from bullets or shot.  Mourning doves are particularly susceptible to ingesting lead shot pellets, and lead poisoning may kill as many as 20 million doves per year in the United States.

48.    Lead can act as a neurotoxin, and numerous studies indicate that blood lead concentrations even below 10 micrograms per deciliter can have adverse developmental effects on intellectual functioning and social-behavioral conduct in humans.  Human fetuses and young children are particularly sensitive to even low levels of lead exposure and can easily suffer permanent neurological damage.  Clinicians now assert there is no safe level of lead in the body tissues for fetuses and young children.

49.    Hunters who use lead bullets are at risk of lead poisoning in several ways. One exposure mechanism is inhalation of airborne lead created by friction from lead slugs against the gun barrel, whereby inhaled lead enters the bloodstream.  Hunters are also exposed to lead residue ingestion when they handle lead bullets.

50.    The most serious risk of exposure for humans is from accidental ingestion of lead shot pellets or lead bullet fragments in meat.  Health effects in human beings following ingestion of whole lead shot pellets have been reported in many cases. Ingestion of meat tissues containing minute flakes or fragments of metallic lead from the passage of lead shot or lead bullet fragments through the tissues is also possible.

51.    For example, in a highly publicized recent case, packets of venison shot with lead bullets or shot and donated by hunters to feed the hungry tested positive for lead contamination.  Fifty-nine of 100 randomly sampled packages of meat had one or more visible lead fragments.  Venison donation programs operate in all 50 states, and are estimated to provide a total of approximately 10 million meals annually.

52.    Ammunition manufacturers now market a wide variety of non-lead, nontoxic bullets and shotgun shot that can replace existing lead projectiles.  There is no

technological or commercial reason why nontoxic bullets and shot with comparable effectiveness should not be substituted in ammunition for their lead counterparts.

53.     In fact, several states have mandated nontoxic shotgun shot for upland game bird hunting and other partial bans.  However, states with no regulations for non-lead hunting other than waterfowl and even those states with partial regulations, such as California's requirement for big game hunting with nontoxic ammunition within the eight-county range of California condors, continue to have high rates of lead poisoning in wildlife.

54.     The EPA has long held that whenever a toxic substance customarily used in the manufacture of commercial products can be replaced by a nontoxic substitute, articles made of the toxic substance should be removed from the market.  All shot and bullets containing lead could economically be replaced with effective, nontoxic alternatives.

**B.     Petition to Regulate Lead Bullets and Shot in Hunting Ammunition and Shooting Sports**

55.     On March 13, 2012, Plaintiffs submitted to the EPA a petition requesting that EPA initiate a rulemaking for regulations that adequately protect wildlife, human health and the environment against the unreasonable risk of injury from bullets and shot containing lead used in hunting and shooting sports, which have the potential to cause harmful lead exposure to wildlife and humans.

56.     The Petition specifically noted that it was a substantially different petition from the prior 2010 petition, pointing out the different and much larger group of petitioners, the significantly different remedy and nature of regulations being sought, the new information regarding the toxic effects of lead bullets and shot on wildlife and human health, the new information regarding the availability and performance of alternatives to lead ammunition, the new information regarding the effectiveness of lead

ammunition regulations, and the new information regarding the scope of the EPA's authority to regulate lead bullets and shot.

57.     The Petition presented strong evidence that lead bullets and shot pose an unreasonable risk to health and the environment and that the risk cannot be prevented through action under other federal laws.

58.     The Petition identified commercially available alternatives to lead rifle bullets, rimfire bullets, and shotgun pellets containing lead.  It acknowledged that not all products available in lead are currently available as nontoxic alternatives, but it also shows that the demonstrated technology indicates that all products could be produced in non-toxic alternatives within a short period of time if manufacturers are provided a transition period for expanding upon current designs and stocks of ammunition.

59.     In its April 9, 2012, letter, the EPA stated first that "EPA notes that [Plaintiff] Center for Biological Diversity (CBD) and Project Gutpile (together with several other organizations) previously submitted an almost identical petition request under Section 21 of TSCA, dated August 3, 2010, seeking among other things that EPA regulate lead in ammunition pursuant to Section 6(a) of TSCA by prohibiting the manufacture, processing and distribution in commerce of lead bullets and shot."

60.     The EPA stated in its letter that "[a]s with the original 2010 petition, the 2012 submission recognizes the exclusion in TSCA § 3(2)(B)(v) but argues that TSCA nonetheless provides EPA with the authority to regulate bullet and shot.  While the 2012 submission does argue the issue of EPA's statutory authority slightly differently (including references to the legislative history from 1976), on this issue, the 2012 submission contains no new information that was not previously available to CBD and Project Gutpile."

61.     The EPA further stated in its letter that "the 2012 submission presents almost verbatim the same information regarding toxicity and exposure with regards to lead bullets and shot as the 2010 petition," and that "[o]verall, with respect to the more

than 400 separate citations, only 20 citations were not included in the 2010 petition, and, of those, only six citations appear to post-date the 2010 petition.

62.     The EPA acknowledged in its letter that the 2012 petition requested different relief than that requested in the 2010 petition, but the EPA determined that because the basis for the rejection of the 2010 petition was the EPA's assessment that it did not have the authority to take any regulatory action regarding lead bullets and shot, the distinction in the requested relief between the two petitions was "a distinction without a substantial difference."

## FIRST CAUSE OF ACTION

### (Violation of APA, 5 U.S.C. § 500 *et seq*.)

63.     Plaintiffs re-allege, as if fully set forth therein, each and every allegation contained in the preceding and subsequent paragraphs.

64.     The EPA's decision that the Petition was not cognizable under TSCA was contrary to the plain language of TSCA, ran counter to TSCA's legislative intent, and applied a standard for petitions in excess of that established by TSCA.

65.     The EPA's decision that the Petition was not cognizable under TSCA was arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with the law, in violation of the APA.

## SECOND CAUSE OF ACTION

### (Violation of TSCA, 15 U.S.C. § 2601 *et seq.*)

66.     Plaintiffs re-allege, as if fully set forth therein, each and every allegation contained in the preceding and subsequent paragraphs.

67.     As detailed above, the Petition provided a reasonable basis to conclude that the issuance of a rule to prevent the poisoning of wildlife by lead bullets and shot is necessary to protect health and the environment against an unreasonable risk of injury. The authority of the EPA to act was clearly described.  To the extent the EPA denied the

Petition, it did so wrongfully and failed to give an adequate reason for doing so, in violation of TSCA.

68.     TSCA provides that if a petitioner demonstrates to a court by a preponderance of evidence that there is reasonable basis to conclude that the issuance of such a rule or order is necessary to protect health or environment against an unreasonable risk of injury, then the court shall order the defendants to initiate the petitioned action. 15 U.S.C. § 2620(4)(B)(ii).

69.     Therefore, to the extent that the Court determines that the EPA denied the Petition, Plaintiffs are entitled to a *de novo* judicial review of the Petition.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request relief as follows:

A.     On the First Cause of Action, that the Court declare the EPA's decision that the Petition was not cognizable under TSCA to be arbitrary, capricious, and abuse of discretion, and/or otherwise a violation of law, that the Court set aside the EPA's decision to disregard the Petition, and that the Court order the EPA to properly consider the Petition and either grant or deny it on its merits;

B.     Alternatively, on the Second Cause of Action, that the Court declare that the EPA denied the Petition and that the Court find that there is a reasonable basis for concluding that a rule or order is necessary to protect health or the environment against an unreasonable risk of injury to health or the environment and direct the EPA to initiate rulemaking proceedings in order to develop and implement regulations that adequately protect wildlife, human health and the environment against the unreasonable risk of injury from bullets and shot containing lead used in hunting and shooting sports, which have the potential to cause harmful lead exposure to wildlife and humans;

C.     On both Causes of Action, for costs incurred herein, including reasonable attorneys' fees; and

        D.      For all such other equitable or legal relief that the Court considers just and proper.

Respectfully submitted,

Dated: June 7, 2012              \_\_\_/s/_____
William J. Snape, III (DC Bar No. 455266)
CENTER FOR BIOLOGICAL DIVERSITY
5268 Watson Street, NW
Washington, DC 20016
Telephone: 202-536-9351
Facsimile: 415-436-9683
billsnape@earthlink.net

Adam Keats (Cal. Bar No. 191157) (*pro hac vice* pending)
351 California St., Suite 600
San Francisco, CA 94104
Telephone: 415-436-9682
Facsimile: 415-436-9683
akeats@biologicaldiversity.org

Jaclyn Lopez (Cal. Bar No. 258589) (*pro hac vice* pending)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 2155
St Petersburg, FL, 33731
Telephone: 727-490-9190
jlopez@biologicaldiversity.org

ATTORNEYS FOR PLAINTIFFS

Robert Morgan (DC Bar No. 254565)
THE TRUMPETER SWAN SOCIETY
415 E. Cape Shores Dr.
Lewes, DE 19958-3109
Telephone: 301-466-8915
robmorgan322@gmail.com

ATTORNEY FOR PLAINTIFF THE TRUMPETER
SWAN SOCIETY