**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
THE TRUMPETER SWAN SOCIETY et al.,    )
)
       Plaintiffs                   )
)
       v.                      )      Civ. Action No. 12-929 (EGS)
)
LISA P. JACKSON, in her official capacity    )
as Administrator, United States         )
Environmental Protection Agency,      )
)
and                         )
)
ENVIRONMENTAL PROTECTION AGENCY,   )
)
       Defendants.             )
_____ )

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF**
**SUBJECT MATTER JURISDICTION UNDER RULE 12(B)(1) AND FOR FAILURE TO**
**STATE A CLAIM UNDER RULE 12(B)(6)**

## I.    INTRODUCTION

Plaintiffs argue for two results in this case that are not compatible with the language of

the Toxic Substances Control Act ("TSCA" or "Act").  First, they assert that Defendant the U.S.

Environmental Protection Agency ("EPA" or "Agency") must consider their submission of

March 13, 2012 ("Second Submission") to be a petition under TSCA section 21, 15 U.S.C.

§ 2620, even though the Second Submission effectively requests the same action by EPA –

regulation of lead shot and bullets – on the same grounds as a petition submitted by Plaintiff the

Center for Biological Diversity ("CBD") on August 3, 2010 ("First Petition"), without presenting

any significant, non-cumulative new information.  The result of adopting Plaintiffs' position

would be to enable CBD to escape the effect of section 21's jurisdictional, 60-day limitations

period for judicial review, which this Court relied on in dismissing CBD's claim regarding the

First Petition as untimely.  Second, Plaintiffs insist that EPA has statutory authority to regulate

lead shot and bullets under TSCA despite TSCA section 3(2)(B)(v)'s exemption of shells and

cartridges – of which shot and bullets are, by definition, integral components – from such

regulation.  *See* 15 U.S.C. § 2602(2)(B)(v).  This interpretation would allow indirect regulation

of shells and cartridges exempted from TSCA's scope under section 3(2)(B)(v), frustrating

Congress's intent of barring EPA from regulating ammunition.  In neither case do Plaintiffs

address how their preferred interpretation of TSCA can be reconciled with the Act's plain

language, and therefore EPA's Motion to Dismiss should be granted.

## II.     ARGUMENT

### A.     TSCA Section 21 Does Not Preclude EPA from Treating a Duplicative Second Submission As a Motion to Reconsider Rather than As a Section 21 Petition.

Contrary to Plaintiffs' arguments, TSCA does not provide any particular standard that

EPA must apply in determining whether a submission fits within the scope of the ambiguous

term "petition" in TSCA section 21.  The course of action that EPA did take – examining

whether the Second Submission presented any significant new, non-cumulative information or

was instead simply a recapitulation of the First Petition – was well within the bounds of its

statutory discretion.  Most importantly, EPA's chosen approach, which has been endorsed by the

only federal court to examine this issue, ensures that TSCA section 21's jurisdictional, 60-day

time limit on obtaining judicial review of a petition denial cannot be undermined through the use

of duplicative, successive submissions purporting to be new petitions under section 21.

### 1.     EPA Acted Consistently with TSCA's Plain Language.

EPA's treatment of the Second Submission as a motion for reconsideration rather than as

a TSCA section 21 petition was entirely consistent with the language of the Act.  Plaintiffs'

argument that TSCA's text requires EPA to either grant or deny a petition, Pls.' Opp. at 6-8, misses the mark.  It fails to address the substance of EPA's decision here: that the Second Submission was not a "petition" within the meaning of section 21 in the first place.  Accordingly, Plaintiffs' view of EPA's obligations in handling such a "petition" is irrelevant.  Rather, the Court's must focus on whether EPA permissibly treated the Second Submission as a motion to reconsider its denial of the First Petition.[1]

Plaintiffs seem to believe that EPA must consider any submission as a section 21 petition as long as it purports to be such a petition, is properly filed with EPA, and sets forth factual support, without the Agency exercising any judgment as to whether the submission properly fits within the scope of section 21.  *See* Pls.' Opp. at 7, 11.  However, as this Court recognized in CBD's suit regarding its First Petition, the term "petition" is ambiguous.  *CBD v. Jackson*, 815 F. Supp. 2d 85, 92-93 (D.D.C. 2011).  Just as in that prior case, nothing in the language of section 21 addresses the situation here or bars EPA from construing this ambiguous term to exclude a duplicative, successive submission following the Agency's denial of a section 21 petition, instead considering that second submission as a motion to reconsider the initial denial.  Given section 21's silence on this issue, EPA's treatment of the Second Submission was well within the traditional discretion of agencies to "control the disposition of their caseload."  *Nader v. FCC*, 520 F.2d 182, 195 (D.C. Cir. 1975); *see also GTE Serv. Corp. v. FCC*, 782 F.2d 263, 274 n.12

---

[1] Plaintiffs cite *GTE Service Corp. v. FCC*, 782 F.2d 263 (D.C. Cir. 1986), for the proposition that "[a]n agency abuses [its] discretion when its manner of proceeding significantly prejudices a party or unreasonably delays a resolution," Pls.' Opp. at 5-6,  implying that that statement is relevant to this Court's review.  However, *GTE Service Corp.* was referring to circumstances where agencies had failed to reach *any* decision on matters before them over the course of five to ten years.  *Id.* at 274 & n.13 (citing, for example, *Nader v. FCC*, 520 F.2d 182, 206 (D.C. Cir. 1975)).  Here, EPA made a decision on Plaintiffs' Second Submission; it is simply one with which they disagree.

(D.C. Cir. 1986) ("A number of cases . . ., both of the Supreme Court and this court, have emphasized the inherent powers of an agency to control its own docket.").

Moreover, Plaintiffs never explain how their proposed approach would prevent parties from "circumvent[ing] the limitations period" in section 21, the concern that led the Southern District of Texas to endorse the interpretation that the Agency adopted here in a similar 1990 case, *Walker v. EPA*.  EPA Mot. to Dismiss, Ex. 5, October 15, 1990 *Walker* Opinion at 3.  The best they do is to suggest that EPA should instead have treated the Second Submission as a new section 21 petition and denied it on the ground "that it was identical to a previous petition."  Pls.' Opp. at 7.  Plaintiffs assert that when this denial was then challenged in court, "the question of whether the petition was a new petition or a mere resubmittal would still be relevant in the court's review of the petition."  *Id.*  However, this proposed approach – unlike EPA's – is inconsistent with the language of section 21.  Section 21 relevantly states that, in a civil action challenging the denial of a citizen petition,

> [i]f the petitioner demonstrates to the satisfaction of the court by a preponderance of the evidence that . . . . there is a reasonable basis to conclude that the issuance of such a rule or order is necessary to protect health or the environment against an unreasonable risk of injury to health or the environment . . . the court shall order the Administrator [of EPA] to initiate the action requested by the petition.

15 U.S.C. § 2620(b)(4)(B).  This description of the scope of a civil action under section 21, encompassing only the question of the "unreasonable risk" posed by an alleged toxic substance, does not provide a basis for EPA to argue that a court should not undertake the relevant inquiry into the merits of a rulemaking request because that request duplicates a prior petition.  Undoubtedly Plaintiffs would oppose any attempt by EPA to present such an argument in the hypothetical they describe; the fact that Plaintiffs suggest here that EPA *could* raise this sort of issue in a section 21 suit simply reveals that they realize that otherwise their proposed approach

would eviscerate the 60-day time limit on section 21 actions by allowing a petitioner to restart the clock for such a suit through filing of a duplicative second petition.  Contrary to Plaintiffs' representation, that would indeed be an "untenable result[]."  Pls.' Opp. at 8.

Plaintiffs also do not accurately describe the ostensible negative consequences of EPA's approach.  EPA will not be able to "choose who its litigation opponent shall be," Pls.' Opp. at 7 n.1.  In the scenario Plaintiffs discuss, with 98 petitions filed successively, the initial petition filed will likely be the one that EPA responds to first, a "first-to-file" result that is a familiar feature of litigation in the United States.  *See, e.g.*, *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1187 (9th Cir. 2001) (recognizing that the False Claims Act bars successive plaintiffs from bringing repetitive claims once a suit alleging a particular FCA violation has been filed).  Moreover, regardless of who is first able to file a section 21 suit, any party interested in the outcome such a suit is free to file a motion to intervene as a plaintiff in that action pursuant to Federal Rule of Civil Procedure 24.

Even more importantly, EPA's approach does not "unreasonably and unfairly restrict[] the public's access to the rulemaking process," Pls.' Opp. at 8, or constitute an attempt "to evade TSCA's *de novo* review."  *Id.* at 8 n.2.  Instead, it simply ensures that if petitioners wish to bring suit under section 21 to pursue TSCA regulation, they must abide by the jurisdictional time limits that Congress placed on such actions.  Here, the filers of the First Petition, including CBD, were "provided an opportunity to have [their] petition considered by the court in a de novo proceeding."  15 U.S.C. § 2620(b)(4)(A).  This Court has held that they failed to take advantage of that opportunity within the jurisdictional time limits of section 21, and CBD cannot evade the effect of that ruling merely by filing a second submission effectively duplicating its First Petition.

### 2. EPA's Treatment of Past Submissions Is Not Relevant Here.

Plaintiffs discuss a number of instances that they assert represent EPA decisions to "accept[] and address[] subsequent petitions on the same topic, containing similar requests." Pls.' Opp. at 8. Fundamentally, such examples are beside the point. Just as EPA has the discretion to consider a submission not to be a new section 21 petition where it duplicates a previously filed petition, so too may the Agency decide that a second submission should be addressed on its merits as an independent petition. The existence of cases where EPA has taken the latter approach therefore is not inherently inconsistent with its treatment of the Second Submission, given that the facts of each such situation may differ in pertinent respects and neither the parties nor the Court are aware of the full circumstances of each of the examples cited by Plaintiffs.

### 3. EPA's Handling of the Second Submission Reflects the Usual Treatment of Such Attempts to Evade a Jurisdictional Time Limit on Judicial Review.

EPA's course of action here accords with the D.C. Circuit's approach under other environmental statutes where a party seeks to avoid the effect of a jurisdictional time limit by seeking agency reconsideration. For example, in *American Road & Transportation Builders Ass'n ("ARTBA") v. EPA*, 588 F.3d 1109 (D.C. Cir. 2009), the D.C. Circuit dismissed a suit by ARTBA challenging EPA's denial of its petition for amendment of two Clean Air Act ("CAA") rules regarding the regulation of vehicle engines. *ARTBA* explained that section 307(b) of the CAA, 42 U.S.C. § 7607(b), "simultaneously authorizes and limits judicial review of EPA activity" by allowing parties to file a petition for review of a regulation promulgated under the CAA, but only "'within sixty days from the date notice of such promulgation'" or, if the petition "'is based solely on grounds arising after such sixtieth day, then . . . within sixty days after such

grounds arise.'" *ARTBA*, 588 F.3d at 112 (quoting 42 U.S.C. § 7607(b)(1)).  The court held that – since the petitioner had neither filed suit within 60 days of promulgation of the challenged rules, nor identified any later-arising grounds for its suit, and EPA had not reopened the issue on its own – ARTBA could not restart the 60-day clock to petition for review of those rules under CAA section 307 simply by filing a petition for their amendment and then challenging EPA's denial of that petition.  *Id.* at 1113; *see also National Mining Ass'n v. U.S. Dept. of Interior*, 70 F.3d 1345, 1350-52 (D.C. Cir. 1995) (similar decision with respect to Surface Mining Control and Reclamation Act). Thus, the D.C. Circuit affirmed EPA's position that, where Congress has established a jurisdictional time limit for challenges to EPA action, that time bar precludes a party from getting a second bite at the apple by seeking agency reconsideration, regardless of whether the party has previously been able to litigate the relevant issue.   Plaintiffs suggest no reason why they should nevertheless be able to restart the clock for judicial review under a similar provision in TSCA.

Similarly, in analyzing whether to treat the Second Submission as a new section 21 petition based on whether it presented "significant newly discovered, non-cumulative material," EPA acted in concordance with the longstanding precedent of both the D.C. Circuit and the Supreme Court that a party must present new evidence (or other changed circumstances) in order to obtain judicial review of the denial of a petition to reconsider.  *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 284 (1987); *see also Southwestern Bell Tel. Co. v. FCC*, 180 F.3d 307, 311 (D.C. Cir. 1999) ("[A] petition seeking review of an agency's decision not to reopen a proceeding is not reviewable unless the petition is based upon new evidence or changed circumstances.").  In fact, in reaching that holding, the Supreme Court specifically sought to ensure that such reconsideration petitions do not operate as a means for "extending indefinitely

the time within which . . . agency orders can be judicially overturned." *Bhd. of Locomotive Eng'rs*, 482 U.S. at 279; *see also id.* at 281 (refusing to allow for the "perpetual availability of review" in the face of a statutory limitations period "by the mere device of filing a suggestion that the agency has made a mistake and should consider the matter again").

Meanwhile, TSCA provides no mooring for Plaintiffs' claim that the Act provides some other standard that EPA should have applied in determining whether to treat the Second Submission as a section 21 petition.  They assert that "EPA applied a standard in excess of that established by TSCA," but never specify where such a standard might be found in the statute or what it might be.  Pls.' Opp. at 13.  In fact, it is *EPA's* approach that adheres to the plain text of section 21, by preventing a plaintiff from obtaining review outside of that provision's jurisdictional, 60-day window.

> **4.     EPA's Treatment of the Second Submission Is Consistent with the Legislative History of TSCA Section 21.**

EPA's treatment of the Second Submission likewise presents no conflict with TSCA's legislative history, which – to the extent it addresses the issue of duplicative petitions at all – favors EPA's approach.  While Congress stated that it was enacting section 21 to "'help to protect against lax administration of'" TSCA, Pls.' Opp. at 12 (quoting Sen. Rep. No. 94-698, at 13 (1976)[2]), it at the same time placed an express, jurisdictional time limit on a petitioner's ability to file a civil action under section 21 in pursuit of that goal.  Such general statements, cherry-picked by Plaintiffs from legislative documents, simply cannot override the actual text of

_____

[2] Plaintiffs appear to have miscited two congressional reports regarding TSCA.  To the best of EPA's knowledge, the citation to H.R. Rep. No. 79-313 at 711 (1976) (Committee print) at pages 11-12 of Plaintiffs' Opposition in fact refers to H.R. Conf. Rep. No. 94-1679, at 98 (1976), while the citation to "*Id.* at 169," Pls.' Opp. at 12, should refer to Sen. Rep. No. 94-698, at 13 (1976).  The relevant pages from the two reports are attached as Exhibits 1 (conference report) and 2 (Senate report) to minimize confusion.

section 21, which clearly bars what Plaintiffs seek here: an opportunity to challenge EPA's

denial of its section 21 petition more than 60 days after that denial occurred.

Furthermore, the Conference Report statement that section 21 is meant to prevent EPA

from "avoid[ing] any judicial review," when read in full, provides no reason to second-guess

EPA's treatment of the Second Submission.  H.R. Conf. Rep. No. 94-1679, at 98 (1976) (quoted

in Pls.' Opp. at 11).  That statement clearly pertains only to the portion of section 21 authorizing

a petitioner to file suit if EPA has not acted on a petition within 90 days:

> [T]he conferee's main interest is to make certain that any such petitioner receive
> timely consideration of such petition. By requiring the Administrator to act on any
> such petition within 90 days, the conferees will facilitate such a petitioner's right
> to seek judicial review should the Administrator deny the petition. Otherwise, the
> Administrator could avoid any judicial review simply by failing to take any
> action.

H.R. Conf. Rep. No. 94-1679, at 98 (1976).  Here, EPA did provide timely consideration of the

First Petition, but CBD itself failed to timely challenge the result of that consideration.  Nothing

in the legislative history of TSCA suggests that CBD should be able to try again at its

convenience.

In fact, as explained in EPA's Motion to Dismiss, in the context of petitions to amend or

repeal a rule, Congress did express concern about subjecting EPA "to constant petitions

challenging rules or orders for which adequate judicial review is provided under section 19," and

therefore allowed review of denials of such petitions only under the APA.  H.R. Conf. Rep. No.

94-1679, at 99 (1976) (quoted in EPA Mot. to Dismiss at 13).  Plaintiffs argue that the lack of a

similar measure with respect to petitions for new rules indicates that Congress intended citizens

to be able to submit such petitions without any constraint.  However, that reading ignores the fact

that Congress accomplished the same end by placing a time limit on the opportunity for judicial

review under section 21.  EPA does not seek to cut off judicial review of a petition for any

petitioner complying with that time limit, but section 21 does not provide any entitlement to *continue* seeking review of the same petition where the petitioner fails to file suit within the applicable 60-day window.[3]

Plaintiffs' citation to *Environmental Defense Fund v. Thomas*, 657 F. Supp. 302, 306 (D.D.C. 1987), is also unavailing. *See* Pls.' Opp. at 11. That decision declined to adopt EPA's proposed approach for calculating the expiration of the 60 days for filing an action under section 21 where it would "punish the intended beneficiaries of the statute's action-forcing mechanism," instead applying a different calculation method under which the plaintiff's suit was timely filed within the applicable 60-day window. *Id.* at 307. But this Court has already held that the action challenging EPA's denial of the First Petition was *not* timely filed, and as Defendant-Intervenors point out, Plaintiffs cannot relitigate its original suit. *See* NSSF Mem. in Support of Mot. to Dismiss at 12. *Thomas* recognized that where section 21's statutory time limit for review of agency action does apply, it is "'jurisdictional in nature.'" 657 F. Supp. at 306 (internal quotation marks and citation omitted). EPA's treatment of the Second Submission simply implements that jurisdictional provision as enacted by Congress, and is therefore compatible with *Thomas*.

Meanwhile, the D.C. Circuit decision reviewing *Thomas*, *Environmental Defense Fund v. Reilly*, 909 F.2d 1497 (D.C. Cir. 1990), is not on point here. At the time that case came before

---

[3] Plaintiffs' argument also glosses over the fact that Congress's rationale for providing that denial of *any* section 21 petition for amendment or repeal of a TSCA rule would be subject only to deferential APA review was that such a rule would already have been subject to judicial review under TSCA section 19, 15 U.S.C. § 2618. With respect to a petition for a new rulemaking, on the other hand, an initial section 21 action would in fact be the first chance for a court to review the subject matter of the petition, and in that situation Congress provided that less deferential *de novo* review would apply. It is consistent with this approach to think that Congress would accept that, once a petitioner has had a first bite at the apple in seeking review under section 21, subsequent attempts to pursue the same rulemaking request need not receive the same level of judicial scrutiny.

the D.C. Circuit, the parties had settled their substantive claims under TSCA section 21 through a

consent decree that was entered by the district court.  *Id.* at 1500.  The main issue in *Reilly* was

whether the plaintiffs could continue to pursue overlapping claims under the Administrative

Procedure Act.  *Id.* at 1501.  The legislative history cited by *Reilly* and referred to by Plaintiffs

on page 11 of their Opposition – the statement that section 21 was designed to "ensure that

bureaucratic lethargy does not prevent the appropriate administration of this vital authority,"

*Reilly*, 909 F.2d at 1499 (quoting 122 Cong. Rec. 32,857 (1976) (statement of Sen. Tunney)) –

was merely part of the court's background description of that provision.  And *Reilly*'s discussion

of section 21's application to petitions for rulemaking as opposed to petitions for amendment or

repeal of an existing rule does not touch on how a *duplicative* rulemaking request should be

treated.  *See Reilly*, 909 F.2d at 1503 (cited in Pls.' Opp. at 11).

## 5.     EPA's Reading of Section 21 Merits *Chevron* Deference.

Plaintiffs' arguments for why *Chevron* deference is not due to EPA's interpretation of the

ambiguous term "petition" are cursory and unpersuasive.  Plaintiffs mention that the Agency's

interpretation was contained in a "single letter," was not arrived at through notice-and-comment

rulemaking, and was not published in the Federal Register.  *Id.* at 12-13.  However, as noted in

EPA's Motion to Dismiss, the D.C. Circuit has granted deference under *Chevron* to an agency

interpretation contained in a letter, not arrived at through notice-and-comment rulemaking, and

not published in the Federal Register.[4]  *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262,

1266 (D.C. Cir. 2008) (cited in EPA Mot. to Dismiss at 17); *see also NationBank of North*

*Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 254-55, 257 (1995) (deferring

---

[4] EPA did post the letter responding to the Second Submission online.  *See* EPA, Section 21
Petitions Filed With EPA Since September 2012,
http://www.epa.gov/oppt/chemtest/pubs/petitions.html#petition12 (last visited Sept. 19, 2012).

under *Chevron* to statutory interpretation contained in letter issued by Comptroller of the Currency in granting individual bank's application to sell annuities); *Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1280 (D.C. Cir. 2004) (similar as to FDA letter decision). *California Valley*'s analysis was guided by the framework laid out by the Supreme court in *Barnhart v. Walton*, which held that an agency's statutory interpretation "is not automatically deprived of the judicial deference otherwise its due [under *Chevron*] because it was previously reached through means less formal than notice-and-comment rulemaking." 535 U.S. 212, 213 (2002) (cited in *Cal. Valley Miwok Tribe*, 515 F.3d at 1266). Instead of a narrow inquiry focusing on the use of particular rulemaking procedures, *Barnhart* identified "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time" as relevant factors in determining "the appropriate legal lens through which to view the legality of the Agency interpretation . . . at issue." 535 U.S. at 222.

Most of these factors support the application of *Chevron* deference here. EPA was addressing an "interstitial" legal issue – the threshold question of what constitutes a "petition" for purposes of TSCA section 21, on which Congress was silent; the Agency has relevant expertise in administering section 21 over the course of the last 30 years; and this interpretation is central to the application of section 21 with respect to enforcement of the jurisdictional time bar on section 21 citizen suits. Finally, and perhaps most significantly, EPA previously relied on this same interpretation in the Walker matter as early as 1990, and that interpretation was upheld by a federal court. *See* EPA Mot. to Dismiss, Ex. 5, October 15, 1990 *Walker* Opinion. Furthermore, the Supreme Court's complementary analysis in *United States v. Mead Corp.*,

which focuses on the existence of indications that "Congress would expect the agency to be able to speak with the force of law," also supports deference to EPA's interpretation.  Here, Congress delegated authority to EPA to resolve section 21 petitions, *see* EPA Mot. to Dismiss at 29-30, and in doing so gave no indication that it intended to disturb EPA's "inherent power[] to control its own docket."  *GTE Serv.*, 782 F.2d at 274 n.12.  Accordingly, EPA's reasonable interpretation of the statutory term "petition" should be given deference under *Chevron*.

> **B.   EPA Did Not Act Arbitrarily in Determining that the Second Submission Should Not Be Treated as a Wholly New Section 21 Petition.**
>
> > **1.   EPA Reasonably Focused on the Material Differences Between the Two Submissions.**

EPA's ultimate decision that the Second Submission should be treated as a motion to reconsider was reasonable, given that it presented no significant, non-cumulative new information.  Plaintiffs question EPA's conclusion that the Second Submission was "substantially the same" as the First Petition, asserting that EPA failed to focus on "what is contained in the petition."  Pls.' Opp. at 15.  However, Plaintiffs are incorrect: the Second Submission Denial Letter does discuss the contents of both the First Petition and Second Submission.  *See* EPA Mot. to Dismiss, Ex. 4 at 1-2.  EPA simply centered its analysis on whether there were any "*substantive*" differences between the two submissions, both as to the relief sought and the information presented by each.  *Id.* at 1 (emphasis added).

The Agency's focus on the existence of actual relevant, material differences between the two submissions was reasonable; otherwise, a petitioner could create what Plaintiffs would apparently consider to be a new petition by making superficial alterations to the original petition, or by adding irrelevant but new evidence, even if the underlying substance were still essentially the same.  Likewise, EPA was within its discretion to consider as truly "new" evidence only

those citations that actually post-dated the First Petition, since allowing a petitioner to present pre-existing studies as new evidence warranting reconsideration would provide an easy way for the petitioner to avoid any time limit on seeking judicial review: leave out one or two available studies from the first petition in case, so that if the window for judicial review expires one can simply add those in and present that petition as a "new" submission to restart the clock.  *See Bhd. of Locomotive Eng'rs*, 482 U.S. at 279 (providing for judicial review of an agency denial of a petition for reconsideration based on alleged new evidence only so that the petitioner will have the opportunity to present "facts which, *through no fault of his own*, the original proceeding did not contain" (emphasis added)).  The fact is, it may not be difficult for a petitioner who has failed to comply with a jurisdictional time limit on judicial review to come up with irrelevant or cumulative information to add as purported "new evidence" in order to create a "new" petition to an agency.  EPA's consideration of whether the Second Submission contained "significant newly discovered, non-cumulative material" was a therefore a reasonable approach to forestalling such efforts.  EPA Mot. to Dismiss, Ex. 4 at 2.

The four-factor analysis set forth in *Walker* is also relevant in highlighting the reasonableness of EPA's determination because it similarly addresses the problem of preventing repetitive submissions.  While, as Plaintiffs note, that decision rested on "the content of each" submission being compared, the court did not occupy itself with identifying minor variations between the two submissions at hand, but rather zeroed in on the fact that the second submission was "a repetitive request for identical action on an identical issue long after the time period has expired," and thus its consideration as a new petition would allow the petitioner to evade the jurisdictional time limit of section 21.  EPA Mot. to Dismiss, Ex. 5, October 15, 1990 *Walker* Opinion at 3.   In doing so, the Southern District of Texas looked beyond the particular studies or

arguments contained in the submission to also examine who was filing it and when.  While

Plaintiffs express uncertainty as to "why the identity of the requesting parties should be a factor

in determining if a petition is a resubmittal of a previous petition," Pls.' Opp. at 18, it seems

fairly straightforward to think that where parties participate in the filing of a second rulemaking

request not long after failing to timely contest the denial of a previous similar request, their

purpose may be to evade the effect of section 21's jurisdictional time limit.

**2.**     **The Differences Between the Content of the Two Submissions Were Not Material.**

Since the risks posed by lead shot and bullets are irrelevant if EPA lacks statutory

authority to regulate them, the key substance of the First Petition and the Second Submission is

their discussion of the statutory exclusion in TSCA § 3(2)(B)(v), 15 U.S.C. § 2602(2)(B)(v).

EPA therefore reasonably concluded that the differences between the two submissions were not

substantive because they did not present any new information on this point.  EPA Mot. to

Dismiss, Ex. 4, at 1.  In other words, EPA did not find any basis to consider the Second

Submission to be a new petition warranting a fresh look precisely *because* the essential substance

of the two submissions – a request for EPA to regulate substances outside its statutory authority

– was the same.  *See* 75 Fed. Reg. 58,377, 58,378 (Sept. 24, 2010) ("[B]ecause of the absence of

legal authority under TSCA to grant the petitioners' first request [for regulation of lead shot and

bullets], this request was resolved without reaching the factual argument set forth by the

petitioners.").  That EPA would respond in the same way to each submission, *see* Pls.' Opp. at

15, is simply the product of that fundamental overlap.

Given EPA's focus on the fact that both the First Petition and Second Submission asked

the Agency to regulate lead shot and bullets, Plaintiffs' citation of allegedly new details about the

particular effects of lead ammunition and the effectiveness of existing regulations is irrelevant.

15

Plaintiffs refer to seven new sources relating to "population level effects on two species of wildlife (condors and eiders) from chronic lead poisoning," "the effectiveness of California regulations banning lead ammunition in the condor range on reducing blood lead levels in California condors, golden eagles and turkey vultures," and "additional evidence that spent lead ammunition is the primary route of lead exposure for California condors, bald eagles, golden eagles and turkey vultures." Pls.' Opp. at 21-22.[5]  This purportedly new information, as EPA judged, fundamentally does not alter the identity between the core substance of the two submissions: a request for regulation lying outside EPA's statutory authority.  Meanwhile, although Plaintiffs criticize EPA's statement that the Second Submission replicates large portions of the First Petition nearly verbatim, *see* Pls.' Opp. at 22, even a brief review of the two documents shows that whole paragraphs, pages, and even sections remain unchanged from one to the other, with only occasional insertions describing purportedly new information (along with

---

[5] Should the Court decide that these sources are relevant, it is worth noting that they include: a non-published, non-peer reviewed conference presentation (Finkelstein et al. 2011), EPA Mot. to Dismiss, Ex. 3, Second Submission at 80; and what appears to be a two-page policy paper that does not include any original research and relies on sources dating to 2009 at the latest (Raptor Research Foundation 2011), Second Submission at 98; *see also* Raptor Research Foundation White Paper (2011), http://www.raptorresearchfoundation.org/wp-content/uploads/2010/12/2011_lead_poisoning.pdf (last visited Sept. 19, 2012).  It is not clear what the 2011 "Spectacled Eider Recovery" document attributed to the U.S. Fish and Wildlife Service is, since no citation is provided, Second Submission at 105, but an Internet search based on that title leads to a two-page pamphlet that also does not include any original research.  *See* http://alaska.fws.gov/fisheries/fieldoffice/fairbanks/pdf/Specs.pdf (last visited Sept. 19, 2012).  Plaintiffs' characterization of these documents as "new studies" may at best be called a charitable one.  Pls.' Opp. at 21-22.  The other studies mentioned – California Department of Fish and Game 2009, 2010; Kelly and Johnson 2011; and Kelly et al. 2011 – relate to the effects of lead on California condors, golden eagles, and turkey vultures, which were already the subject of 11 pages of discussion in the First Petition, largely duplicated in the Second Submission.  *Compare* EPA Mot. to Dismiss, Ex. 1, First Petition at 20-31 *with* EPA Mot. to Dismiss, Ex. 3, Second Submission at 29-41; *see also* Pls.' Opp. at 22 (describing these studies as providing "additional evidence" regarding arguments presented in First Petition).

deletions of those portions of the First Petition relating to CBD's request for regulation of lead fishing gear). *Compare, e.g.*, EPA Mot. to Dismiss, Ex. 1, First Petition at 2-3, 14-31 *with* EPA Mot. to Dismiss, Ex. 3, Second Submission at 2-4, 23-41.

Also unavailing is Plaintiffs' argument that the Second Submission newly brought legislative history relating to TSCA section 3(2)(B)(v) to EPA's attention, and therefore the Agency should have considered it a wholly new petition. Pls.' Opp. at 20. As discussed *supra* at 14, to allow a party to submit 30-year-old information as "new" evidence would open the door for easy evasion of section 21's 60-day limitations period. It would also put the burden on *EPA* to investigate and expressly discuss any potentially relevant existing evidence in response to a petition in order to forestall the filing of future duplicative petitions, when TSCA section 21 states that it is the *petitioner* that must present "the facts which it is claimed establish" the need for regulation under TSCA. 15 U.S.C. § 2620(b)(1). Finally, Plaintiffs' argument assumes that when EPA denied the First Petition it was ignorant of the legislative history of the Act it administers, including the legislative history relating to the specific statutory provision that the Agency was construing. That EPA did not discuss that legislative history in the Federal Register notice explaining the basis for denying the First Petition is understandable given that the Agency considered the meaning of TSCA section 3(2)(B)(v) to be plain based on its text alone. *See* 75 Fed. Reg. at 58,378.

That the Second Submission narrowed the relief requested in the First Petition also did not make any material difference regarding the underlying goals and arguments contained in both submissions. Regardless of what caused "concern with the public" or was "raised in the press," Pls.' Opp. at 17, EPA did not rely on the broad scope of the relief requested in the First Petition as a basis for its denial. Plaintiffs' suggestion that "the scope of the relief requested was

a consideration of EPA in its decisionmaking process" on the First Petition, based solely on the

statement in the letter denying that Petition that "EPA has determined that TSCA does not

provide the Agency with authority to address lead shot and bullets as requested in your petition,

due to the exclusion found in TSCA § 3(2)(B)(v)," *see* Pls.' Opp. at 17, strains credulity given

EPA's explanation in the accompanying Federal Register notice that its denial was based on "a

lack of authority to regulate lead in bullets and shot under TSCA" – with no mention of the

particular relief requested by CBD. 75 Fed. Reg. at 58,378.  In its essentials, the Second

Submission was the same as the First Petition.

> ### 3. The Identity of the Parties Filing the Two Submissions, and Their Timing, Also Support EPA's Treatment of the Second Submission As a Motion to Reconsider.

Plaintiffs emphasize that 98 other parties have joined CBD in this second attempt to seek

EPA regulation of lead shot and bullets under TSCA.  *See* Pls.' Opp. at 18.  However, Plaintiffs'

focus is on the wrong end of the issue – which parties are *different*, as opposed to which are the

*same*.  As explained above, *supra* at 15, the *Walker* analysis appears to be concerned with the

latter, as a way to detect whether there is some party seeking a second chance to obtain judicial

review under section 21 after failing to abide by that provision's 60-day time limit with respect

to its original petition.  Here, that indeed seems to be the case, given CBD's central role in both

submissions.  *See* NSSF Mem. in Support of Mot. to Dismiss at 10.  While it may be that CBD

could "just as easily find another person or organization to re-file a petition on their own," Pls.'

Opp. at 18 (emphasis omitted), the fact remains that it did not do so, and is now back again for a

second time.  Furthermore, the number of parties that CBD recruited to join it in this suit is

irrelevant, especially given that their only evident level of participation is being listed on the

petition and – as to six of them – on the Complaint.

Similarly, the timing of events leading up to this litigation suggests that it is a vehicle for CBD to re-file the suit that it was unsuccessful in bringing with respect to the First Petition. Plaintiffs incorrectly focus on whether some absolute amount of time elapsed between the two submissions.  Pls.' Opp. at 19.  However, as explained in EPA's Motion to Dismiss at 19, it is just as much the sequence of events – with the Second Submission filed just six months after CBD's claim regarding the First Petition was dismissed as untimely – that suggests this Court should view the Second Submission and this suit as an attempt to escape the effect of that initial dismissal.

    **C.**    **TSCA Section 3(2)(B)(v) Exempts Lead Shot and Bullets from EPA Regulation Under TSCA.**

        **1.**    **In Order to Be Effective, the Plain Language of TSCA Section 3(2)(B)(v) Must Encompass the Constituent Components of the Exempted Items.**

EPA's Motion to Dismiss explains that the exemption in TSCA section 3(2)(B)(v), 15 U.S.C. § 2602(2)(B)(v), for "any article the sale of which is subject to the tax imposed by section 4181 of the Internal Revenue Code," must apply to shot and bullets because they are intrinsic components of shells and cartridges, two items that are subject to taxation under 26 U.S.C. § 4181.  EPA Mot. to Dismiss at 22-23.  Plaintiffs' cramped reading of these two provisions would render the TSCA exemption for firearms and ammunition without effect by allowing indirect regulation of shells and cartridges through regulation of their components, a problem that they never squarely confront.

Plaintiffs insist that the cross-reference to 26 U.S.C. § 4181 was merely meant to incorporate only the list of articles in that provision, and therefore TSCA section 3(2)(B)(v) does not bar the regulation of any individual constituent components of those articles .  Pls.' Opp. at 25.  However, Congress expressly did not prohibit the regulation under TSCA of "any article

*listed*" in section 4181. Instead, Congress exempted "any article *the sale of which is subject to the tax imposed by section 4181*." 15 U.S.C. § 2602(2)(B)(v). That language goes beyond a mere cross-reference to a list and implicates the question of what is actually being "subject to" taxation when 26 U.S.C. § 4181 is applied; therefore, contrary to Plaintiffs' contention, it *does* matter "whether the component parts are effectively taxed or not when a cartridge or shell is taxed under section 4181." Pls.' Opp. at 25. Shot and bullets, which are constituent components of shells and cartridges, are effectively subject to that tax.

EPA is not arguing that a bullet is the same as a cartridge, or a shot is the same as a shell, Pls.' Opp. at 24, but rather that TSCA's regulatory exemption for shells and cartridges must include their constituent components – shot and bullets. Otherwise everything from gun magazines to gun barrels would be fair game for EPA regulation under TSCA, leading to *de facto* regulation of guns and ammunition. Plaintiffs present no solution to this problem other than to argue it is not their intent to seek gun control. *See* Pls.' Opp. at 29 (suggesting that TSCA section 3(2)(B)(v) was meant only to prevent the use of "TSCA . . . as a back-door mechanism for gun control because it can harm people when fired from a gun"). But the plain language of 15 U.S.C. § 2602(2)(B)(v) offers no loophole for those with a particular intent; instead, it completely removes shells and cartridges from EPA's regulatory jurisdiction, and with them their constituent components of shot and bullets.

## 2. Even if TSCA Section 3(2)(B)(v) Is Ambiguous, EPA's Interpretation of the Provision Should Be Upheld.

Plaintiffs rely entirely on one piece of legislative history to establish the reasonableness of their interpretation of TSCA section 3(2)(B)(v): a House Report stating that the exemption for pistols, revolvers, firearms, shells, and cartridges "does not exclude from regulation under the bill chemical components of ammunition which could be hazardous because of their chemical

properties." H.R. Rep. No. 94-1341, at 10 (1976) (quoted in Pls.' Opp. at 27). However, that passage itself contains the rebuttal to Plaintiffs' arguments. They recognize that "Congress was clearly concerned that TSCA not be used as a mechanism for gun control," Pls.' Opp. at 28, yet their construction of TSCA section 3(2)(B)(v) would allow just that forbidden result by permitting EPA to regulate shells and cartridges under TSCA.

EPA's reading, on the other hand, provides a clear line between exempted and non-exempted chemical substances, while still allowing for regulation of "chemical components of ammunition" – *i.e.*, lead – when used in other contexts. Such regulation might indirectly affect shot and bullets if EPA were to impose a *general* restriction on the use of chemical substances such as lead, as in Plaintiffs' hypothetical regarding a ban on any sale of lead at all, Pls.' Opp. at 29, but that type of incidental effect is *not* the same as *specifically* regulating *integral constituent components* of shells and cartridges as such.[6] In the former case, the object of EPA's regulation would be a chemical substance as used in multiple contexts beyond ammunition; in the latter instance, EPA would be specifically targeting shot and bullets alone for regulation, effectively achieving a result prohibited by TSCA section 3(2)(B)(v) – the regulation of shells and cartridges. Thus, EPA's interpretation of TSCA section 3(2)(B)(v) merits deference as a "reasonable accommodation" of both Congress's express bar on regulating shells and cartridges under TSCA and the Act's general authorization for the Agency to regulate chemical substances and mixtures. *See Chevron*, 467 U.S. at 845 (internal quotation marks and citation omitted).

---

[6] Given that no such regulation banning all sales of lead has been proposed, it is not clear that Plaintiffs are correct in their assumption that EPA *would* have statutory authority to impose such a direct ban on the sale of lead specifically destined for use in ammunition. However, a ban on the sale of lead for other purposes could affect the overall supply of lead in a way that would indirectly impinge on the market for lead ammunition.

EPA's interpretation is not rendered unreasonable by the fact that the equivalent

provision in the Consumer Product Safety Act ("CPSA"), 15 U.S.C. § 2052(5)(E), expressly bars

regulation  by the Consumer Products Safety Commission of components of articles taxed under

26 U.S.C. § 4181.  Indeed, Plaintiffs have it backwards.  While the available legislative history

does not indicate why, four years after enacting the CPSA in 1972, Congress chose to include

somewhat different language in TSCA, its intent in both cases was clearly the same.  *See* EPA

Mot. to Dismiss at 26.  Therefore, these two provisions should be read to have the same scope

even if they do not use the exact same language.  *Cf. FAIC Securities, Inc. v. United States*, 768

F.2d 352, 363 (D.C. Cir. 1985) (holding that statutes with "common purpose" should not "be

construed to reach different results" even though their provisions regarding the same regulatory

topic had different language); *McGlotten v. Connelly*, 338 F. Supp. 448, 453 (D.D.C. 1972)

(interpreting two statutory provisions to have same coverage despite their differing language

because Congress intended them to operate "in the same fashion") (cited in *Investment Annuity,

Inc. v. Blumenthal*, 609 F.2d 1, 4 n.13 (D.C. Cir. 1979)).  Otherwise, there would be regulation of

items under TSCA that would be barred under the CPSA, and Plaintiffs offer no explanation of

why Congress would desire such a result given that it expressed the exact same purpose in

enacting both 15 U.S.C. § 2052(5)(E) and 15 U.S.C. § 2062(2)(B)(v).

>        **3.        EPA's Reading of TSCA Section 3(2)(B)(v) Merits *Chevron* Deference.**

EPA's construction of the definition of "chemical substance," a key term in a statute that

the Agency administers, merits *Chevron* deference.  TSCA section 3(2)(B)(v)'s cross-reference

to the Internal Revenue Code does not deprive EPA of its role as the delegated authority for

implementing TSCA, including the definition of the term "chemical substance," as Plaintiffs

argue.  Pls.' Opp. at 31.  It is clear from the parties' briefing that – if this Court determines that

the language of TSCA section 3(2)(B)(v) is ambiguous – the dispute in this case centers on Congress's intent in enacting section 3(2)(B)(v) itself; there is no question regarding the purpose of 26 U.S.C. § 4181.  *See* EPA Mot. to Dismiss at 27-32 (explaining that EPA's reading of TSCA section 3(2)(B)(v) is reasonable given the text of that provision, its legislative history, and EPA's past practice in applying the provision); Pls.' Opp. at 27-30 (arguing that EPA's interpretation of TSCA section 3(2)(B)(v) is not consistent with Congress's intent based on the legislative history of that provision, without any discussion of the legislative intent behind 26 U.S.C. § 4181).  While EPA disputes Plaintiffs' construction of the plain meaning of 26 U.S.C. § 4181, we seek *Chevron* deference only with respect to EPA's interpretation that the exemption in TSCA section 3(2)(B)(v) must encompass the constituent components of shells and cartridges as well as those items themselves, if the Court decides that shot and bullets are not subject to taxation under 26 U.S.C. § 4181.

Plaintiffs' only other argument on this front is that *Chevron* deference is not warranted where an agency is determining the scope of its own authority.[7]  Pls.' Opp. at 30.  However, they are simply incorrect that it is an open question in this Circuit whether *Chevron* deference applies in such a circumstance.  The cases they cite for this proposition date back to 1988 and 1990, and have since been superseded.  *See* Pls.' Opp. at 30 n.8.  As the D.C. Circuit stated in *Transmission*

---

[7] The suggestion that the *de novo* review standard in section 21 has any role to play here, *see* Pls.' Opp. at 31-32, is not consistent with the applicable *Chevron* framework.  The *de novo* standard applies to judicial review under *TSCA section 21* in determining if a rulemaking proceeding is warranted under TSCA because a petitioner has presented *factual* evidence as to whether, in this case, a chemical substance presents an "unreasonable risk to health or to the environment."  15 U.S.C. § 2620(b)(4)(B).  It has no relevance to the question of whether EPA administers TSCA section 3(2)(B)(v), which is the threshold issue in deciding if the Agency's interpretation of that provision merits *Chevron* deference.  *See* EPA Mot. to Dismiss at 9.  In case there is any dispute, EPA does administer TSCA.  *See* 15 U.S.C. § 2601(c) ("It is the intent of Congress that the Administrator shall carry out this chapter . . . .").

*Access Policy Study Group v. FERC*, "it is the law of this circuit that the deferential standard of *Chevron* . . . applies to an agency's interpretation of its own jurisdiction." 225 F.3d 667, 694 (D.C. Cir. 2000) (citing *Oklahoma Natural Gas Co. v. FERC*, 28 F.3d 1281, 1283-84 (D.C. Cir. 1994)).

Congress entrusted EPA with the task of administering TSCA, including application of the definition of "chemical substance" and its statutory exemptions.  EPA arrived at a reasonable reading of TSCA section 3(2)(B)(v) in the course of fulfilling that duty, and if the Court determines that section 3(2)(B)(v) is ambiguous, that interpretation merits deference under *Chevron*.

## III.    CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' complaint.


Respectfully submitted,

Dated: September 24, 2012            IGNACIA S. MORENO
                                     Assistant Attorney General

                                     /s/ Madeline Fleisher
                                     MADELINE FLEISHER, MA Bar #670262
                                     Environmental Defense Section
                                     United States Department of Justice
                                     P.O. Box 7611
                                     Washington, D.C.  20044
                                     Telephone: (202) 514-0242
                                     Fax: (202) 514-8865
                                     madeline.fleisher@usdoj.gov

OF COUNSEL:

ERIN S. KOCH
U.S. Environmental Protection Agency
Office of General Counsel
1200 Pennsylvania Ave., N.W.

Washington, D.C. 20460

**CERTIFICATE OF SERVICE**

I hereby certify that on September 24, 2012, I served the foregoing Reply with the

corresponding Notice of Electronic Filing via CM/ECF system, which sent notification of such

filing to all attorneys of record.

/s/ Madeline Fleisher
MADELINE FLEISHER